**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **NEW ORLEANS MISSION, INC.** | * | **CIVIL ACTION NO.:** |
| | * | |
| **Plaintiff,** | * | **SECTION:** |
| | * | |
| **Versus** | * | **JUDGE** |
| | * | |
| | * | **MAG. JUDGE:** |
| | * | |
| **MCKESSON CORPORATION, CARDINAL HEALTH, INC., AMERISOURCE BERGEN, CVS HEALTH, WALGREENS BOOTS ALLIANCE, INC., WAL-MART STORES, INC. PURDUE PHARMA, L.P., PURDUE PHARMA, INC., THE PURDUE FREDERICK COMPANY, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., CEPHALON, INC., JOHNSON & JOHNSON, JANSSEN PHARMACEUTICALS, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC., ENDO HEALTH SOLUTIONS, INC., ENDO PHARMACEUTICALS, INC., ALLERGEN PLC f/k/a ACTIVIS PLC, WATSON PHARMACEUTICALS, INC., n/k/a ACTIVIS, INC., WATSON LABORATORIES, INC., ACTIVIS, LLC., AND ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

---

# PETITION FOR DAMAGES

Plaintiff, the **NEW ORLEANS MISSION, INC. ("NEW ORLEANS MISSION"),** for its action against files this Petition for Damages and Injunctive Relief against Defendants named herein, respectfully alleges as follows:

## INTRODUCTION

1.

Plaintiff, the **NEW ORLEANS MISSION**, is a non-profit organization founded in 1989 committed to rescuing people from physical or sexual abuse, mental illness, financial hardship, and chronic homelessness. The largest faith-based private service provider to the homeless population in the greater New Orleans area, the **NEW ORLEANS MISSION**, focuses on strengthening the recovery efforts of the people struggling with long-term substance abuse and providing vocational training and paid employment to foster their successful re-engagement into society as healthy, disciplined, skilled people ready to lead a sustainable, productive, purpose-driven life.

2.

Programs offered by the **NEW ORLEANS MISSION** are funded through the financial support received from local residents, churches, organization, foundation grants, and corporate donors that understand the importance of being socially responsible to the people in need of support in the communities where they live or do business. No governmental funding is received for their operational expenses.

3.

Aside from the general walk-ins from the street intake process, city agencies including the Public Defenders' Office, Probation and Parole, and local police departments through the Angel Project Program and Drug Court direct people to the **NEW ORLEANS MISSION** through their Re-Entry Program. From 2017 through 2018, the **NEW ORLEANS MISSION** served 2540 men and women struggling with long-term substance abuse and possible various degrees of mental illness.

4.

There is an addiction epidemic of prescription opioid abuse sweeping through the United States that has caused health care providers extraordinary economic damages, substantial loss of resources, employee disability, myriad human and capital costs. This epidemic is the largest health care crisis in U.S. history.

5.

Prescription opioids are deadlier than heroin. According to the National Institutes of Health, prescription opioids kill almost twice as many people in the United State as heroin. Prescription opioids and related drug overdose deaths surpass car accident deaths in the U.S.

6.

Drug manufacturers undertook an orchestrated campaign to flood Louisiana with highly-addictive and dangerous opioids ("opioid analgesic pain relievers" or "opioids") in an effort to maximize profits above the health and well-being of their customers including the healthcare systems supporting those customers. Importantly, these drug manufacturers knew prescribing

doctors and other health-care providers relied upon statements and representations from these same drug manufacturers in determining treatment decisions. Instead of providing truthful representations regarding the dangerous and addictive opioid analgesic pain relievers they produce, these same drug manufacturers provided false and misleading statements unsupported by science and medical evidence in an effort to promote the purchase and widespread use of their dangerous and addictive narcotics.

7.

As a result of these false and misleading representations concerning opioid analgesic pain relievers, these drug manufacturers caused a healthcare crisis that has had far-reaching health, financial, social, and deadly consequences in Louisiana and throughout the United States. On July 31, 2017, the Commission on Combating Drug Addiction and the Opioid Crisis ("Commission") issued an interim report recommending to the President of the United States that he declare the opioid epidemic a national emergency.[1] In that interim report, the Commission grimly declared: "Our nation is in crisis."[2] Notably, the Commission explained: "Since 1999, the number of opioid overdoses in America have quadrupled according to the CDC. Not coincidently, in that same period, the amount of prescription opioids in America have quadrupled as well."[3]

8.

This epidemic and its consequences could have been and should have been prevented by the Defendants who control the U.S. drug distribution industry and the Defendants who manufacture the prescription opioids. These Defendants have profited greatly by allowing the

[1] https://www.whitehouse.gov/sites/whitehouse.gov/files/oncp/commission-interim-report.pdf.
[2] *Id.* at p. 1.
[3] *Id.*

geographic area which the **NEW ORLEANS MISSION** serves to become flooded with prescription opioids.

9.

The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients. Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

10.

Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers – with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

11.

Defendants' wrongful conduct has allowed millions of opioid pills to be diverted from legitimate channels of distribution to the illicit black market in quantities that have fueled the opioid epidemic in a client demographic area of the **NEW ORLEANS MISSION**. This is characterized as "opioid diversion." Acting against their common law and statutory duties, Defendants have created and environment in which opioid diversion is rampant. As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

12.

Louisiana is one of eight states that has more opioid prescriptions than it has residents. In 2013, Louisiana ranked first in opioid prescribing, according to the CDC Morbidity and Mortality Weekly Report and the Louisiana Department of Health and Hospitals. The state was found to have the sixth highest prescription-per-capita rate at 1.03 pain killer prescriptions written per Louisiana resident in 2015, meaning that in 2015, there were more opioid prescriptions written in Louisiana than there were people living in Louisiana.[4]

13.

As the Louisiana Department of Health Secretary, Dr. Rebekah Gee, has said, "the opioid epidemic [has] become one of the worst public health scourges in America. It has led to deaths in every parish in this state."[5] According to the Trust for America's Health, the number of deaths caused by opioid overdose has tripled in Louisiana since 1999.[6] Louisiana recorded nearly 780 overdose deaths in 2014 alone.[7] And according to a study by researcher Christopher Ruhm of the University of Virginia, published in the *American Journal of Medicine,* due to limitations in opioid death data collection and reporting, actual opioid deaths for 2014 were likely 24% higher nationally than previously estimated and more than 100% higher than reported in certain states,

---

[4] Louisiana Department of Health: Frequently Asked Questions about Opioid Prescribing. Available at http://ldh.la.gov/assets/opioid/OpioidFAQFactSheet.pdf

[5] Rebekah Allen "Bill to combat opioid abuse signed into law, limits prescriptions, aims to stop 'doctor shopping'" The Advocate June 12, 2017. Available at http://www.theadvocate.com/baton_rouge/news/politics/legislature/article_0b34c0f6-4fa3-11e7-9088-abcacae397bc.html

[6] Key Health Data About Louisiana. Trust for America's Health. Available at http://healthyamericans.org/states/?stateid=LA

[7] *Id.*

including Louisiana.[8] Drug overdoses are now the leading cause of injury death in Louisiana, surpassing motor-vehicle related deaths.[9]

14.

For years, Defendants and their agents have had the ability to substantially reduce the death toll and adverse economic consequences of opioid diversion, including the deaths and health ruination of hundreds of thousands of citizens. Substantial expenditures by the **NEW ORLEANS MISSION** dealing with the problem have gone un-recouped and unreimbursed. All the Defendants in this action share responsibility for perpetuating the epidemic.

15.

Defendants have foreseeably caused damages to the **NEW ORLEANS MISSION** including the unreimbursed and/or un-recouped costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (b) counseling and rehabilitation services; (c) security and public safety; (d) added regulatory compliance; (e) lost opportunity costs; (f) the diversion of assets from the provision of other needed health care; and (g) increased human resources costs as well as lost productivity of its employees.

16.

The **NEW ORLEANS MISSION** brings this civil action for injunctive relief, compensatory damages, statutory damages, and any other relief allowed by law against the

[8] Christopher J. Ruhm, "Geographic Variation in Opioid and Heroin Involved Drug Poisoning Mortality Rates" American Journal of Preventative Medicine Published Online August 7, 2017. Available at http://www.ajpmonline.org/article/S0749-3797(17)30313-6/fulltext.

[9] "The Facts Hurt: A State-By-State Injury Prevention Policy Report" Trust for America's Health. Available at http://healthyamericans.org/reports/injuryprevention15/

Defendant opioid drug distributors, retailers, and manufacturers that, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably injured and continues to injure the **NEW ORLEANS MISSION**.

## PARTIES

### I. Plaintiff

17.

Plaintiff, the **NEW ORLEANS MISSION**, is a non-profit corporation and has its principal place of business in New Orleans, Louisiana. Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiff has standing to bring all claims pled herein, including *inter alia*, standing to recover damages caused by a criminal act; standing to recover damages under the Louisiana Unfair Trade Practices Act; standing to bring claims under the Louisiana racketeering statute; and standing to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) – and the **NEW ORLEANS MISSION** holds legal title to property.

Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiff seeks relief. Categories of Plaintiff's past and continuing sustained damages include the unreimbursed and/or un-recouped costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addition or disease, including overdoses and deaths; (b) counseling and rehabilitation services; (c) security and public safety; (d) added regulatory compliance; (e) lost opportunity costs; (f) the diversion of assets from the provision of other needed health care; and (g) increased human resources costs as well as lost productivity of its employees.

Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

## II. Distributor Defendants

18.

**McKesson Corporation** ("McKesson") has its principal place of business in San Francisco, California and is incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in the geographic area of the clients of the **NEW ORLEANS MISSION**.

19.

**Cardinal Health, Inc.** ("Cardinal") has its principal place of business in Ohio and is incorporated under the laws of Ohio. During all relevant times, Cardinal has distributed substantial amounts of prescription opioids to providers and retailers in the geographic area of the clients of the **NEW ORLEANS MISSION**.

20.

**AmerisourceBergen** has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in the geographic area of clients of the **NEW ORLEANS MISSION**.

21.

**McKesson, Cardinal, and AmerisourceBergen** are collectively referred to hereinafter as "Distributor Defendants."

## III. Pharmacy Defendants

22.

**CVS Health** is a Delaware corporation with its principal place of business in Rhode Island. During all relevant times, CVS Health has sold and continues to sell prescription opioids in close proximity to the hospitals, clinics, and other health care facilities serving clients of the **NEW ORLEANS MISSION**.

23.

**Walgreens Boots Alliance, Inc., a/k/a Walgreen Co.** ("Walgreens") is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Walgreens has sold and continues to sell prescription opioids in close proximity to the hospitals, clinics, and other healthcare facilities serving clients of the **NEW ORLEANS MISSION**.

24.

**Wal-Mart Stores, Inc.** ("Wal-Mart") is a Delaware corporation with its principal place of business in Arkansas. At all relevant times, Wal-Mart has sold and continues to sell prescription opioids at locations in close proximity to the hospitals, clinics and other healthcare facilities serving clients of the **NEW ORLEANS MISSION**.

25.

**CVS Health, Walgreens, and Wal-Mart** are collectively referred to hereinafter as the "Pharmacy Defendants."

## IV. Pharmaceutical Defendants

26.

**Purdue Pharma L.P.** is a limited partnership organized under the laws of Delaware. **Purdue Pharma Inc.** is a New York corporation with its principal place of business in Stamford,

Connecticut, and **The Purdue Frederick Company** is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue"). Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the U.S. and Louisiana. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

27.

**Cephalon, Inc.** ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and Louisiana. Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

28.

**Teva Pharmaceutical Industries, Ltd.** ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon. **Teva Pharmaceuticals USA, Inc.** ("Teva USA") is a wholly-owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011.

29.

Teva Ltd., Teva USA, and Cephalon collaborate to market and sell Cephalon products in the U.S. Teva Ltd. conducts all sales and marketing activities for Cephalon in the U.S. through Teva USA. Teva Ltd. and Teva USA publicize Actiq and Fentora as Teva products. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Louisiana, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon to disclose that it is a wholly-owned subsidiary of Teva Ltd. on prescription savings cards distributed in Louisiana, indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own. Through interrelated operations like these, Teva Ltd. operates in Louisiana and the rest of the U.S. through its subsidiaries, Cephalon and Teva USA. The U.S. is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Ltd., Teva USA, and Cephalon, Inc. are hereinafter collectively referred to as "Cephalon."

30.

**Janssen Pharmaceuticals, Inc.** is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of **Johnson &Johnson**

(J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. **Ortho-McNeil-Janssen Pharmaceuticals, Inc.**, now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. **Janssen Pharmaceutica Inc.**, now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are collectively referred to as "Janssen."). Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and Louisiana, including the opioid Duragesic. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

31.

**Endo Health Solutions Inc.** is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. **Endo Pharmaceuticals Inc.** is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "Endo.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Louisiana. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in

2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Louisiana, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

32.

**Allergan PLC** is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013. Before that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, later to Actavis PLC in October 2013. **Watson Laboratories, Inc.** is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.). **Actavis Pharma, Inc.** (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan PLC exercises control over and derives financial benefit from the marketing, sales, and profits of Allergan/Actavis products. (Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter are referred to collectively as "Actavis.") Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the U.S. and Louisiana. Actavis acquired the

rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

33.

**Purdue, Cephalon, Janssen, Endo, and Actavis** are collectively referred to hereinafter as the "Pharmaceutical Defendants."

## JURISDICTION AND VENUE

34.

This is an action brought by the **NEW ORLEANS MISSION** based on the distinct harm suffered by the **NEW ORLEANS MISSION** caused by Defendants' violations of state law and legal duties owed.

35.

Jurisdiction of this Court arises under the laws of the United States 28 U.S.C. Sec. 1392 as the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of attorney fees and costs.

36.

Defendants have engaged in conduct and activities over a long period of time, systematically, individually, jointly, and severally, in the geographic area served by the **NEW ORLEANS MISSION** that have caused all of the Plaintiff's damages and all of which form the bases of causes of action in this Petition against Defendants. Defendants have committed multiple torts and beaches within the geographic area that the **NEW ORLEANS MISSION** serves, repeatedly and systematically.

37.

This Court has personal jurisdiction over Defendants, each of which has committed torts, in part or whole, within the State of Louisiana and the geographic areas served by the **NEW ORLEANS MISSION**, as alleged herein. Moreover, Defendants have substantial contacts and business dealings directly with the **NEW ORLEANS MISSION** by virtue of their distribution, dispensing, and sales of prescription opioids. All causes of action herein relate to Defendants' wrongful actions, conduct, and omissions committed against the **NEW ORLEANS MISSION**, and the consequences and damages related to said wrongful actions, conduct, and omissions.

38.

Venue is proper in this Court pursuant to 28 U.S.C. 1392 (b)(2) in that a substantial part of the events giving rise to the claims occurred in the Eastern District of Louisiana.

## FACTS

39.

Opioid literally means "opium-like" and the term includes all drugs derived in whole or in part from the opium poppy.

40.

The United States Food and Drug Administration's website describes this class of drugs as follows: "[p]rescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, they can cause serious harm, including addiction, overdose, and death."

41.

Prescription opioids with the highest potential for addiction are categorized under Schedule II of the Controlled Substances Act. They include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also referred to as "opiates"), partially-synthetic derivatives (such as hydrocodone and oxycodone), or fully-synthetic derivatives (such as fentanyl and methadone).

42.

Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain relating to recovery form surgery for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patience developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

## PHARMACEUTICAL DEFENDANTS

43.

To establish and exploit the lucrative market of chronic pain patients, each Pharmaceutical Defendant developed a well-funded, sophisticated, and deceptive marketing and/or distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefitted other Defendants and opioid manufacturers. These statements were unsupported by and contrary to the

scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations, including those in the geographic area served by the **NEW ORLEANS MISSION.**

44.

The Pharmaceutical Defendant spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in Louisiana. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the geographic area of the clients of the **NEW ORLEANS MISSION.**

45.

The Pharmaceutical Defendants' direct and branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website, opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain relief and functional improvement. Purdue ran a series of ads called, "Pain Vignettes," for OxyContin that featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. While Endo and Purdue agreed in 2015-2016 to stop these particularly misleading representations in New York but continued to disseminate them in Louisiana.

46.

The Pharmaceutical Defendants also promoted the use of opioids for chronic pain through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and medical staff, and fomented small-group speaker programs. In 2014, for instance, these Defendants spent almost $200 million on detailing branded opioids to doctors.

47.

The FDA has cited at least one of these Defendants for deceptive promotions by its detailers and direct-to-physician marketing. In 2010, an FDA-mandated "Dear Doctor" letter required Actavis to inform doctors that "Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders are subject to criminal diversion."

48.

The Pharmaceutical Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by these Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by these Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

49.

The Pharmaceutical Defendants' detailing to doctors was highly effective in the national proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctor, allowing specific and individual targeting, customizing, and monitoring of their marketing.

50.

The Pharmaceutical Defendants have had unified marketing plans and strategies from state to state, including Louisiana. This unified approach ensures that Defendants' messages were and are consistent and effective across all their marketing efforts.

51.

The Pharmaceutical Defendants deceptively marketed opioids in Louisiana through unbranded advertising that promoted opioid use generally, yet silent as to a specific opioid. This advertising was ostensibly created and disseminated by independent third parties, but funded, directed, coordinated, edited, and distributed, in part or whole, by these Defendants and their public relations firms and agents.

52.

The Pharmaceutical Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny as such advertising is not submitted to or reviewed by the FDA. These Defendants used third-party, unbranded advertising to create the false appearance that the deceptive messages came from an independent and objective source. The Pharmaceutical

Defendants' deceptive unbranded marketing also contradicted their branded materials reviewed by the FDA.

53.

The Pharmaceutical Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid industry pipeline, from manufacture to distribution to retail.

54.

These Defendants entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

55.

The Pharmaceutical Defendants collaborated, through the aforementioned organizations and groups, to spread deceptive messages about the risks and benefits of long-term opioid therapy.

56.

To convince doctors and patients in Louisiana that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, these Defendants made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

57.

To convince doctors and patients that opioids are safe, the Pharmaceutical Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, they continue to make them today.

58.

The Pharmaceutical Defendants falsely claimed that the risk of opioid addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly;

and failed to disclose the greater risk of addiction with prolonged use of opioids. Some examples of these false and deceptive claims by opioid manufacturers are: (a) Actavis employed a patient education brochure that falsely claimed opioid addiction is "less likely if you have never had an addiction problem;" (b) Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain: A Guide for People Living with Pain*, falsely claiming that addiction is rare and limited to extreme cases of unauthorized doses; (c) Endo sponsored a website, Painknowledge.com, which falsely claimed that "[p]eople who take opioids as prescribed usually do not become addicted;" (d) Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "most people do not develop an addiction problem;" (e) Janssen distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults*, which described as "myth" the claim that opioids are addictive; (f) a Janssen website falsely claimed that concerns about opioid addiction are "overestimated;" (g) Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – that falsely claims that pain is undertreated due to "misconceptions about opioid addiction."

59.

These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

60.

The FDA further exposed the falsity of the Pharmaceutical Defendants' claims about the low risk of addiction when it announced changes to the labels for certain opioids in 2013 and for other opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

61.

The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids

generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This agreement, however, did not extend to Louisiana.

62.

The Pharmaceutical Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction" – a term used by Dr. David Haddox, who went to work for Purdue, and Dr. Russell Portenoy, a KOL for Cephalon, Endo, Janssen, and Purdue. Defendants falsely claimed that pseudo-addiction was substantiated by scientific evidence. Some examples of these deceptive claims are: (a) Cephalon and Purdue sponsored *Responsible Opioid Prescribing*, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated"; (c) Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain; (d) Purdue sponsored a deceptive CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse* in which a narrator notes that because of pseudo-addiction, a doctor should not assume the patient is addicted.

63.

The 2016 CDC Guideline rejects the concept of pseudo-addiction, explaining that"[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are

unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

64.

The Pharmaceutical Defendants falsely instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Pharmaceutical Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Pharmaceutical Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids. Some examples of these deceptive claims are: (a) an Endo supplement in the *Journal of Family Practice* emphasized the effectiveness of screening tools to avoid addictions; (b) Purdue's webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths;" (c) Purdue represented in scientific conferences that "bad apple" patients – and not opioids – were the source of the addiction crisis, when in fact the "bad apples" were the Defendants.

65.

The 2016 CDC Guideline exposes the falsity of these misrepresentations, noting that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter

abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The Guideline emphasizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

66.

To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Pharmaceutical Defendants falsely claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

67.

A CME sponsored by Endo, entitled *Persistent Pain in the Older Adult,* claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by up to 20% for a few days. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, that claimed "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," without mentioning any known or foreseeable issues.

68.

Pharmaceutical Defendants deceptively minimized the significant symptoms of opioid withdrawal – which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after

long-term opioid use. The 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause and restart" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced, or opioids are discontinued."

69.

The Pharmaceutical Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. For example: (a) an Actavis patient brochure stated - "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction;" (b) Cephalon and Purdue sponsored *APF's Treatment Options: A Guide for People Living with Pain*, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain; (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain;" (d) an Endo

pamphlet, *Understanding Your Pain: Taking Oral Opioid Analgesics*, stated "The dose can be increased. . . . You won't 'run out' of pain relief;" (e) a Janssen patient education guide *Finding Relief: Pain Management for Older Adults* listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages; (f) Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will; (g) Purdue's *A Policymaker's Guide to Understanding Pain & Its Management* stated that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages; (g) a Purdue CME entitled *Overview of Management Options* taught that NSAIDs and other drugs, but not opioids, were unsafe at high dosages; (h) Purdue presented a 2015 paper at the College on the Problems of Drug Dependence challenging the correlation between opioid dosage and overdose.

70.

These and other representations conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

71.

The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

72.

The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

73.

Pharmaceutical Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

74.

Pharmaceutical Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER falsely claimed that it was designed to be crush resistant, in

a way that suggested it was more difficult to abuse. The FDA warned in a 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

75.

In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be or is crush resistant." The State found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER. Similarly, the 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies – even when they work – "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."

76.

These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Pharmaceutical Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid

use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and deceptive claims, they continue to make them today.

77.

For example, the Pharmaceutical Defendants falsely claimed that long-term opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives; (b) an Endo advertisement that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide *Finding Relief: Pain Management for Older Adults* stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreation, sex, walking, and climbing stairs; (d) Purdue advertisements of OxyContin entitled "Pain vignettes" implied that OxyContin improves patients' function; (e) *Responsible Opioid Prescribing,* by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function; (f) Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* counseling patients that opioids "give [pain patients] a quality of life we deserve;" (g) Endo's NIPC website *painknowledge.com* claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse;" (h) Endo CMEs titled *Persistent Pain in the Older Patient* claimed that chronic opioid therapy had

been "shown to reduce pain and improve depressive symptoms and cognitive functioning;"(i) Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function;" (j) Purdue's *A Policymaker's Guide to Understanding Pain & Its Management* claimed that "multiple clinical studies" had shown opioids as effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients; (k) Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

78.

These claims find no support in the scientific literature. The 2016 CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."
- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."
- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

79.

The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

80.

The 2016 CDC Guideline was not the first time a federal agency repudiated the Pharmaceutical Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

81.

The Pharmaceutical Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment

options" like non-opioid drugs "are inadequate." The 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

82.

In addition, Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all relevant times. According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

83.

Purdue's competitors were aware of this problem. For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Indeed, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

84.

Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

85.

Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example: (a) Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer-or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain; (b) Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of

non-cancer pain; (c) In December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News*– three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

86.

Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain but were also approved by the FDA for such uses.

87.

Purdue unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the *Los Angeles Times*, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did

not report until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described internally as "an organized drug ring." In doing so, Purdue protected its own profits at the expense of public health and safety.

88.

The State of New York's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

89.

Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

90.

As a part of their deceptive marketing scheme, the Pharmaceutical Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., Louisiana, and the geographic area served by the **NEW ORLEANS MISSION**. For example, these Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs but were less likely to be educated about treating pain and

the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations.

91.

The Pharmaceutical Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. These Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concludes that there are "special risks of long-term opioid use for elderly patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

92.

The Pharmaceutical Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned these Defendants of this, and these Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction,

hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements prohibiting them from making some of the same misrepresentations described in this Petition for Damages in New York.

93.

Moreover, at all times relevant to this Petition for Damages, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.

94.

The Pharmaceutical Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org,

which is run by the NIPC, did not disclose Endo's involvement. Other Pharmaceutical Defendants, such as Purdue and Janssen, ran similar websites that masked their own direct role.

95.

Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by clients of the **NEW ORLEANS MISSION**.

96.

Thus, the Pharmaceutical Defendants successfully concealed from the medical community, patients, and health care payers facts sufficient to arouse suspicion of the claims that the **NEW ORLEANS MISSION** now asserts. The **NEW ORLEANS MISSION** did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

97.

The Pharmaceutical Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in

January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

98.

The Pharmaceutical Defendants' deceptive marketing scheme caused and continues to cause doctors in Louisiana, and specifically in the geographic area served by the **NEW ORLEANS MISSION** to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent these Defendants' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

99.

The Pharmaceutical Defendants' deceptive marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their deceptive marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011, that spending had tripled to $288 million.

100.

The escalating number of opioid prescriptions written by doctors who were deceived by the Pharmaceutical Defendants' deceptive marketing scheme is the cause of a correspondingly

dramatic increase in opioid addiction, overdose, and death throughout the U.S., Louisiana, and in the geographic area served by the **NEW ORLEANS MISSION**.

In August 2016, the U.S. Surgeon General published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."

101.

Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

102.

Contrary to the Pharmaceutical Defendants' misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the internet. Numerous doctors and substance abuse counselors note that many of their patients, whom is use or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

103.

Opioid-related death tolls are rising at such a rapid pace that cities and counties are unable to keep up logistically.

**DISTRIBUTOR DEFENDANTS**

104.

The supply chain for prescription opioids begins with the manufacturing and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Distributor Defendants, Cardinal, McKesson, and AmerisourceBergen, which together account for 85 to 90 percent of all revenues from drug distribution in the United States, estimated to be at $378.4 billion in 2015. The distributors then supply opioids to hospitals, pharmacies, doctors, and other healthcare providers, which then dispense the drugs to patients.

105.

Each participant in the supply chain shares the responsibility for controlling the availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain, including at the pharmacy level when prescriptions are filled for any reason other than a legitimate medical purpose.

106.

For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from retailers or prescribers. Suspicious orders include orders of unusually large size, orders that

are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

107.

Diversion also occurs at the pharmacy level, including whenever a pharmacist fills a prescription despite having reason to believe it was not issued for a legitimate medical purpose and not in the usual course of professional practice. Some of the signs that a prescription may have been issued for an illegitimate medical purpose include: (1) when the patient seeks to fill multiple prescriptions from different doctors (known as doctor shopping); (2) when they travel great distance between the doctor and the pharmacy to have the prescription filled; (3) when they present multiple prescriptions for the largest dose of more than one controlled substance; or (4) when there are other "red flags" surrounding the transaction. These signs or "red flags" should trigger closer scrutiny of the prescriptions by the pharmacy and lead to a decision that the patient is not seeking the medication for purposes to treat a legitimate medical condition. In addition to diversion via prescription, opioids are also diverted from retail outlets when they are stolen by employees or others.

108.

Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions. At the patient level, seeking prescription opioids under false pretenses can also be a route through which prescription opioids are deflected from medical source into the illicit market.

109.

Opioid diversion occurs in the United States at an alarming rate. In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

110.

Every year, millions of people in the United States misuse and abuse opioid pain relievers that can lead to addiction, overdose, and death.

111.

Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States. Overdose deaths involving prescription opioids are at epidemic proportions, quadrupling since 1999, concomitant with sales of these prescriptions.

112.

In 2011, the Centers for Disease Control ("CDC") reported that overdose deaths from prescription opioids reached epidemic levels. According to the National Institutes of Health, 16,917 people died from a prescription opioid related overdose that year. Since then, the death toll has continued to rise. In 2014, the number of people who died from a prescription opioid related overdose rose to 18,893. In 2015, the deaths increased to 22,598, despite the increased public health announcements.

113.

The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008-2010, 77.4% of the participants reported using

prescription opioids before initiating heroin use. Another study revealed that 75% of those who began their opioid abuse in the 2000s started with a prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin. Heroin deaths are on a tragic upswing: In 2015, over 12,898 people died from heroin overdose-up more than 20% from approximately 10,574 overdose deaths in 2014.

114.

The **NEW ORLEANS MISSION** has been uniquely and significantly damaged by the effects of the Distributor Defendants' opioid diversion.

115.

The CDC reports that for every opioid-related death, there are on average 10 hospital admissions for abuse, 26 emergency department visits for misuse, 108 people who are dependent on opioids, and 733 non-medical users.

116.

Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

117.

The Distributor Defendants are governed by the statutory requirements of the Controlled Substances Act ("CSA"), 21 U.S.C. §801 et seq. and its implementing regulations. These requirements were enacted to protect society from the harms of drug diversion. The Distributor

Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

118.

By violating the CSA, the Distributor Defendants are also liable under the Louisiana Unfair Trade Practice and Consumer Protection Act, which specifically makes it a civil offense to violate statutes affecting or impacting chattels bought for medical purposes. The CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." See H.R.Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 4572.115.

119.

Accordingly, the CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the legal to the illicit marketplace, and there is enormous potential for harm to the public.

120.

All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual

size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

121.

To prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances, including registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("'ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances, acquisition transactions, and distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

122.

Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. 21 U.S.C. § 827(d) (l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

123.

In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. 21 U.S.C. §§ 827(a)(3),1304.2l(a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the record keeping and reporting requirements.

124.

To order to maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. 21 CFR § 1301.71.

125.

For years, the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain. The problem of opioid diversion in the supply chain has been widely publicized for years. Numerous publications, studies, federal agencies, and professional organizations have highlighted the epidemic rate of opioid abuse and overdose rates in communities in Louisiana, including the geographic area the **NEW ORLEANS MISSION** serves, as well as throughout the United States.

126.

To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions.

127.

Since 2006, the DEA has conducted one-on-one briefings with distributors regarding their downstream customer sales, due diligence responsibilities, and their legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA). The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were also given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA emphasized the "red flags" distributors should look for to identify potential diversion.

128.

Since 2007, the DEA has hosted at least five conferences to provide opioid distributors with updated information about diversion trends and regulatory changes that affect the drug supply chain, the distributor initiative, and suspicious order reporting. The Defendant Distributors attended at least one of these conferences. The conferences allowed the registrants to ask questions, raise concerns, and request clarification on DEA policies, procedures, and interpretations of the CSA and implementing regulations.

129.

Since 2008, the DEA has participated in numerous meetings and events with the legacy Healthcare Distribution Management Association (HDMA), now known as the Healthcare Distribution Alliance (HAD), an industry trade association for wholesalers and distributors. DEA representatives have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.[10]

130.

On September 27, 2006 and again on December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

131.

The September 27, 2006 letter reminded registrants that they were required by law to exercise due diligence to avoid filling orders that could be diverted into the illicit market. The DEA explained that as part of the legal obligation to maintain effective controls against diversion, the distributor was required to exercise due care in confirming the legitimacy of each and every order prior to filling. It also described circumstances that could be indicative of diversion including: (1) ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; (2) disproportionate ratio of ordering controlled substances versus non-controlled

[10] HDMA, "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," (2008).

prescription drugs; (3) the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and (4) ordering the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to decide if the order is indeed suspicious.

132.

On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence. The letter reminded registrants that suspicious orders must be reported when discovered and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility. Finally, the letter directed the registrant community to review a recent DEA action called *Southwood Pharmaceuticals, Inc.*, 72 FR 36487 (2007) that addressed criteria in determining suspicious orders and their obligation to maintain effective controls against diversion.

133.

The Distributor Defendants' were on notice that their own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines entitled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" that stressed the critical role of each member of the supply chain in distributing controlled substances.

134.

These industry guidelines further provided: "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

135.

Opioid distributors have themselves recognized the magnitude of the problem and, at least rhetorically, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

136.

For example, a Cardinal executive claimed that Cardinal uses “advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity." (emphasis added).

137.

McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

138.

These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

139.

Thus, in addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

140.

The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties recovered by state and federal agencies -- including actions by the DEA related to violations of the Controlled Substances Act.

141.

In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states. In December 2016, a Department of Justice press release announced a multi-million-dollar settlement with Cardinal for violations of the Controlled Substances Act. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Florida that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

142.

In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine. McKesson also was supposed to implement tougher controls regarding opioid diversion. McKesson utterly failed. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer. Again in 2015, McKesson was in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017, it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.

143.

In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

144.

State Boards of Pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion. On June 17, 2009, Cardinal Health was disciplined in two separate cases for violations in pharmacies that it operates in Oklahoma. In Case No. 926, a pharmacy technician at Oklahoma State University Medical Center Pharmacy was allowed to illegally purchase 30,800 prescription opioids. As a result, Cardinal Health was cited for failing to prevent diversion and agreed to "maintain a compliance program designed to detect and prevent diversion of controlled substances… [that] shall include procedures to review orders for controlled substances." In Case No. 927, a pharmacy technician at Hillcrest Medical Center Pharmacy diverted 399,500 tablets (street value of $3,966,500.00) of hydrocodone. The Oklahoma Board again cited Cardinal Health for failing to prevent diversion and Cardinal Health again agreed to implement a system to detect and prevent further diversion.

145.

Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

146.

The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to the **NEW ORLEANS MISSION.**

147.

The Distributor Defendants have supplied massive quantities of prescription opioids in and around the geographic areas served by the **NEW ORLEANS MISSION** with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-

medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

148.

Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed to flow into the geographic areas served by the **NEW ORLEANS MISSION** was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

149.

The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around the geographic area served by the **NEW ORLEANS MISSION**; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

150.

On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing clients of the **NEW ORLEANS MISSION** and in the geographic area served by the **NEW ORLEANS MISSION** to perform due diligence inspections to ensure that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

151.

On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the clients of the **NEW ORLEANS MISSION** and in the geographic area served by the **NEW ORLEANS MISSION**, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

152.

It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the geographic area served by the **NEW ORLEANS MISSION** with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

153.

It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death.

It is also reasonably foreseeable that the costs of these injuries will be shouldered by the **NEW ORLEANS MISSION.**

154.

The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid costs of the **NEW ORLEANS MISSION**, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

155.

The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to clients of the **NEW ORLEANS MISSION** and in the geographic area served by the **NEW ORLEANS MISSION** were being dispensed based on invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third-parties, and the **NEW ORLEANS MISSION**.

156.

The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become clients of the **NEW ORLEANS MISSION**, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas served by the **NEW ORLEANS MISSION** -- and in such quantities, and with such frequency -- that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

157.

The use of opioids by the **NEW ORLEANS MISSION** clients who were addicted or did not have a medically-necessary purpose could not occur without the knowing cooperation and

assistance of the Distributor Defendants. If any of the Distributor Defendants adhered to effective controls to guard against diversion, the **NEW ORLEANS MISSION** would have avoided significant damages.

158.

The Distributor Defendants made substantial profits over the years based on the diversion of opioids affecting the **NEW ORLEANS MISSION**. Their participation and cooperation in a common enterprise has foreseeably caused damages to the **NEW ORLEANS MISSION**. The Distributor Defendants knew full well that the **NEW ORLEANS MISSION** would be unjustly forced to bear the costs of these injuries and damages.

159.

The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for the **NEW ORLEANS MISSION** Their conduct poses a continuing economic threat to the **NEW ORLEANS MISSION.**

**PHARMACY DEFENDANTS**

160.

Pharmacies must exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

161.

Pharmacies are the "last line of defense" in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system and as such have

considerable duties and responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a doctor, even one registered under the CSA to dispense opioids, if the prescription is not for a legitimate medical purpose.

162.

The CSA imposes duties and requirements on the conduct of the Pharmacy Defendants. These requirements, along with their related regulations and agency interpretations, set a standard of care for pharmacy conduct.

163.

The CSA requires pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid.

164.

Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. §1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

165.

Pharmacists are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice.

166.

By filling prescriptions of questionable or suspicious origin in violation of the CSA, the Pharmacy Defendants have violated the Louisiana Unfair Trade Practice and Consumer Protection Act.

167.

The DEA's 2010 "Practitioner's Manual" section on "Valid Prescription Requirements" instructs that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription." Filling such a prescription is illegal. This Manual states: "The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted."

168.

The DEA (as well as state pharmacy boards, national industry associations, and continuing educational programs) have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify "red flags", which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient. The guidance also tells pharmacists how to resolve the "red flags" and what to do if the "red flags" are unresolvable.

169.

The industry guidance tells pharmacists how to recognize stolen prescription pads; prescription pads printed using a legitimate doctor' s name, but with a different call back number

that is answered by an accomplice of the drug-seeker; prescriptions written using fictitious patient names and addresses, and so on.

170.

Questionable or suspicious prescriptions include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or dosages that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwritings. Most of the time, these attributes are not difficult to detect or recognize; they should be apparent to an adequately trained pharmacist.

171.

Signs that a customer is seeking opioids for the purpose of diversion include customers who: (1) appear to be returning too frequently; (2) are seeking to fill a prescription written for a different person; (3) appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; (4) are not regular patrons or residents of the community, and show up with prescriptions from the same physician; (5) drive long distances to have prescriptions filled; (6) seek large volumes of controlled substances in the highest strength in each prescription; (7) seek a combination of other drugs with opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and (8) pay large

amounts of cash for their prescriptions rather than using insurance. Ignoring these signs violates industry standards and DEA guidelines.

172.

Other "red flags" include when prescriptions that lack the technical requirements of a valid prescription, such as a verifiable DEA number and signature; prescriptions written in excess of the amount needed for proper therapeutic purposes; prescriptions obtained through disreputable or illegal web-based pharmacies; and patients receiving multiple types of narcotic pain killers on the same day.

173.

All of these issues have been presented by the DEA in pharmacist training programs throughout the United States and have been used as examples by individual state boards of pharmacy and the National Association of Boards of Pharmacy.

174.

Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription order. If a pharmacist is ever in doubt, he or she must ask for proper identification. If a pharmacist believes the prescription is forged or altered, he or she should not dispense it and call the local police. If a pharmacist believes he or she has discovered a pattern of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

175.

A standard of care for the Pharmacy Defendants is also set by applicable professional regulations in the state of Louisiana. It is a violation of professional standards not to attempt to

address the suspected addiction of a patient to a drug dispensed by the pharmacist, if there is reason to believe the patient may be addicted.

176.

On information and belief, the Pharmacy Defendants regularly filled prescriptions in circumstances where "red flags" were present (and sometimes many "red flags").

177.

On information and belief, the Pharmacy Defendants regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

178.

On information and belief, the Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid prescriptions or protect against corruption or theft by employees or others.

179.

On information and belief, the Pharmacy Defendants utilize monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices. For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the "red flags" presented.

180.

The Pharmacy Defendants have violated a voluntarily undertaken duty to the public. In news reports and other public documents, it has been reported that the Pharmacy Defendants, through their words or actions, have assured the public that issues affecting public health and safety are the highest priority for the defendants.

181.

For example, in 2015, CVS publicly stated that, "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."

182.

In failing to take adequate measures to prevent substantial opioid-related injuries that have affected the **NEW ORLEANS MISSION**, the Pharmacy Defendants have breached their duties under the "reasonable care" standard, professional duties under the relevant standards of professional practice, and requirements established by federal law under the CSA.

183.

It is foreseeable to the Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to individual pharmacy customers, the **NEW ORLEANS MISSION** clients who may use the wrongfully-dispensed opioids.

184.

It is reasonably foreseeable to the Pharmacy Defendants that, when unintended users gain access to opioids, tragic yet preventable injuries and damages will result, including overdoses and death.

185.

At all relevant times, the Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in opioid diversion.

186.

At all relevant times, the Pharmacy Defendants engaged in these activities, and continue to do so, knowing full well that the **NEW ORLEANS MISSION**, in their role of providing medical care, substance abuse counseling and services, would provide or pay for additional medical services, emergency services, and other necessary services, and would suffer the loss of substantial economic productivity.

187.

It is reasonably foreseeable to the Pharmacy Defendants that the **NEW ORLEANS MISSION** would be forced to bear substantial expenses as a result of the Pharmacy Defendants' acts.

188.

The Pharmacy Defendants were on notice of their ongoing negligence or intentional misconduct towards the **NEW ORLEANS MISSION** in part because of their history of being penalized for violating their duties and legal requirements in other jurisdictions.

189.

In 2013, Defendant CVS agreed to pay $11 million to avoid civil charges for violating federal laws relating to the sales of prescription opioids at pharmacies in the state of Oklahoma. Specifically, CVS allegedly violated the recordkeeping requirements for tracking and dispensing prescription drugs including oxycodone and hydrocodone.

190.

In August of 2013, Defendant CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.

191.

In January 2014, Defendant Walgreens was fined $178,500 by the Oklahoma Pharmacy Board for destroying years' worth of pharmacy records.

192.

Nationally, Walgreens has settled investigations with the DEA related to controlled substances in both Florida and California. The Florida settlement involved an $80 million civil fine.

193.

Defendants, CVS, Walgreens, and Wal-Mart each have one or more pharmacies that fill prescriptions for opioids which are operating within or in close proximity to the geographic areas served by the **NEW ORLEANS MISSION.**

194.

The Louisiana Board of Pharmacy has also prosecuted, and disciplined numerous pharmacists and pharmacy technicians employed by the Pharmacy Defendants, all of which have had stores located in the geographic area served by the **NEW ORLEANS MISSION** for diversion of prescription opioids.

195.

The Pharmacy Defendants were also aware of the magnitude of the opioid diversion crisis based on investigations into their practices elsewhere. For example, in 2013, Walgreens settled with the DEA for $80 million, resolving allegations that it committed an unprecedented number of record-keeping and dispensing violations at various retail locations and a distribution center. As

part of the settlement, Walgreens agreed to enhance its training and compliance programs, and to no longer compensate its pharmacists based on the volume of prescriptions filled.

196.

Similarly, in 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

197.

CVS also agreed to pay $450,000 to resolve allegations that pharmacists were filling opioid prescriptions written by unauthorized medical personnel. More recently, in 2016, CVS settled a case pending in Massachusetts, by agreeing to pay $3.5 million to resolve allegations that fifty CVS stores violated the CSA by filling forged oxycodone prescriptions more than 500 times between 2011 and 2014.

## COUNT I – ALL DEFENDANTS

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICE

## AND

## CONSUMER PROTECTION ACT

198.

The **NEW ORLEANS MISSION** reasserts the allegations of all other paragraphs in this Complaint as set for fully herein.

199.

The Louisiana Unfair Trade Practice and Consumer Protection Act ("LUTPCPA") prohibits deceptive acts or practices in the conduct of any trade or commerce.

200.

Defendants were in the position to implement effective business practices to guard against diversion of the highly addictive opioid products they sell and distribute. Instead, they profited off the opioid prescription drug epidemic by ignoring anti-diversion laws, while burdening the **NEW ORLEANS MISSION** with the economic and human consequences created by their conduct.

201.

Defendants turned a blind eye to the problem of opioid diversion and profited from the sale of prescription opioids in quantities that far exceeded the number of prescriptions that could reasonably have been used for legitimate medical purposes, despite having notice or actual knowledge of widespread opioid diversion from prescribing records, pharmacy orders, field reports, and sales representatives.

202.

The foregoing conduct constitutes an unfair, deceptive, unscrupulous, and immoral trade practice that is against public policy, in violation of LUTPCPA.

203.

The federal Controlled Substances Act is a federal law affecting or impacting both chattels bought for medical purposes, and services for commercial or business use.

204.

Each act by any Defendant that violated federal law under the CSA constitutes a violation of the LUTPCPA. Defendants violated the CSA and its implementing regulations by:

a. Filling suspicious or invalid orders for prescription opioids at both the wholesale and retail level;

b. Failing to maintain effective controls against opioid diversion;

c. Failing to operate an effective system to disclose suspicious orders of controlled substances;

d. Failing to report suspicious orders of controlled substances;

e. Failing to reasonably maintain necessary records of opioid transactions; and

f. Deliberately ignoring questionable and/or obviously invalid prescriptions and filling them anyway.

205.

The aforementioned actions of Defendants each constitute a violation of the LUTPCPA and each caused substantial damage and injury to the **NEW ORLEANS MISSION**.

206.

The **NEW ORLEANS MISSION** is entitled to recover civil damages and penalties for each of Defendants' violations, as well as injunctive relief, reasonable attorneys' fees, and whatever other relief may be deemed appropriate.

## COUNT II – ALL DEFENDANTS

## NUISANCE

207.

The **NEW ORLEANS MISSION** reasserts the allegations of all other paragraphs in this Complaint as if fully set for here, and further alleges as follows.

208.

The nuisance is the over-saturation of opioids in the client population of the **NEW ORLEANS MISSION** and in the geographic area served by the **NEW ORLEANS MISSION** for non-medical purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use.

209.

All Defendants substantially participated in nuisance-causing activities.

210.

Defendants' nuisance-causing activities include selling or facilitating the sale of prescription opioids to the clients of the **NEW ORLEANS MISSION**, as well as to unintended users, including children, people at risk of overdose or suicide, and criminals.

211.

Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

212.

Defendants' activities unreasonably interfere with the economic rights of the **NEW ORLEANS MISSION.**

213.

The Defendants' interference with these rights of the **NEW ORLEANS MISSION** is unreasonable because it:

a. Has harmed and will continue to harm the public health services of and public peace of the **NEW ORLEANS MISSION**;

b. Has harmed and will continue to harm the communities and neighborhoods which the **NEW ORLEANS MISSION** services;

c. Is proscribed by statutes and regulation, including the CSA, pharmacy regulations, and the consumer protection statute;

d. Is of a continuing nature and it has produced long-lasting effects; and

e. Defendants have reason to know their conduct has a significant effect upon the **NEW ORLEANS MISSION**.

214.

The nuisance undermines public health, quality of life, and safety. It has resulted in increased crime and property damage. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and entire communities.

215.

The resources of the **NEW ORLEANS MISSION** are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources needed in other areas.

216.

Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in failing to identify, halt, and report suspicious opioid transactions.

217.

At all times, all Defendants possessed the right and ability to control the nuisance-causing outflow of opioids from pharmacy locations or other points of sale. Distributor Defendants had the power to shut off the supply of illicit opioids to clients of the **NEW ORLEANS MISSION** and in the geographic area served by the **NEW ORLEANS MISSION.**

218.

As a direct and proximate result of the nuisance, the **NEW ORLEANS MISSION** has sustained economic harm by spending a substantial amount of money trying to remedy the harms caused by Defendants' nuisance-causing activity.

219.

The **NEW ORLEANS MISSION** has also suffered unique harms different from individual opioid users and governmental entities at large, namely, that the **NEW ORLEANS MISSION** has been harmed in their proprietary interests.

220.

The effects of the nuisance can be abated, and the further occurrence of such harm and inconvenience can be prevented. All Defendants share in the responsibility for doing so.

221.

Defendants should be required to pay the expenses the **NEW ORLEANS MISSION** has incurred or will incur in the future to fully abate the nuisance.

## <u>COUNT III – ALL DEFENDANTS</u>

## NEGLIGENCE/GROSS NEGLIGENCE

222.

The **NEW ORLEANS MISSION** reasserts the allegations of all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

223.

Defendants owe a non-delegable duty to the **NEW ORLEANS MISSION** to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

224.

There is no social value to Defendants' challenged behavior. In fact, Defendants' entire conduct, behavior, actions, misrepresentations, conspiracies, and omissions are against the law.

225.

On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of the **NEW ORLEANS MISSION** and its clients.

226.

Defendants' behavior caused a substantial injury and damage to the **NEW ORLEANS MISSION**.

227.

Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

a. Consciously supplying the market in the geographic area served by the **NEW ORLEANS MISSION** with highly-addictive prescription opioids;

b. Using unsafe distribution and dispensing practices;

c. Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d. Failing to properly train or investigate their employees;

e. Failing to properly review prescription orders for "red flags;"

f. Failing to report suspicious orders or refuse to fill them;

g. Failing to provide effective controls and procedures to guard against theft and diversion of controlled substances; and

h. Failing to police the integrity of their supply chains.

228.

Each Defendant had an ability to control the opioids at a time when it knew or should have known it was passing control of the opioids to an actor further down in the supply chain that was incompetent or acting illegally and should not be entrusted with the opioids.

229.

Each Defendant sold prescription opioids in the supply chain knowing both that (a) there was a substantial likelihood many of the sales were for non-medical purposes; and (b) opioids are an inherently dangerous product when used for non-medical purposes.

230.

Defendants were negligent or reckless in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

231.

Controlled substances are dangerous commodities. Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business.

232.

Defendants were also negligent or reckless in failing to guard against foreseeable third-party misconduct, e.g., the foreseeable conduct of: corrupt prescribers, corrupt pharmacists and staff, and/or criminals who buy and sell opioids for non-medical purposes.

233.

Defendants are in a limited class of registrants authorized to legally distribute controlled substances. This places Defendants in a position of great trust and responsibility vis-à-vis the **NEW ORLEANS MISSION** and its client communities. Defendants owe a special duty to the **NEW ORLEANS MISSION**. That duty cannot be delegated to another party.

234.

The **NEW ORLEANS MISSION** is without fault, and the injuries to the **NEW ORLEANS MISSION** would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

235.

The aforementioned conduct of Defendants proximately caused damage to the **NEW ORLEANS MISSION.**

## COUNT IV – ALL DEFENDANTS

## UNJUST ENRICHMENT

236.

The **NEW ORLEANS MISSION** reasserts the allegations of all other paragraphs in this Complaint as if fully set for here, and further alleges as follows.

237.

The **NEW ORLEANS MISSION** has expended substantial amounts of money to address, remedy and/or mitigate the societal harms caused by Defendants' conduct.

238.

The expenditures by the **NEW ORLEANS MISSION** in providing healthcare and services to people who use opioids have added to Defendants' wealth. The expenditures by the **NEW ORLEANS MISSION** have helped sustain Defendants' businesses.

239.

The **NEW ORLEANS MISSION** has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities-the costs of the harm caused by Defendants' negligent distribution and sales practices.

240.

Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

241.

Defendants made substantial profits while fueling the prescription drug epidemic in the geographic area served by the **NEW ORLEANS MISSION**.

242.

Defendants continue to receive considerable profits from the distribution of controlled substances in the geographic area serviced by the **NEW ORLEANS MISSION**.

243.

Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

244.

It would be inequitable to allow Defendants to retain the benefit or financial advantage of their wrongdoing.

245.

The **NEW ORLEANS MISSION** demands judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

**COUNT V – ALL DEFENDANTS**

**FRAUD**

246.

The **NEW ORLEANS MISSION** incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

247.

Pharmaceutical Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

248.

Defendant Purdue made and/or disseminated deceptive statements, including, but not limited to, the following: (a) advertising that opioids improved long-term functioning long-term and were suitable for the treatment of chronic non-cancer pain; (b) promoting the concept of pseudo-addiction; (c) brochures concerning indicators of possible opioid abuse; (d) suitability of opioids for high-risk patients; (d) publications presenting an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; (e) concealment of funding of pro-opioid KOL doctors regarding treatment for chronic non-cancer pain; (f) downplaying of the risks of opioid addiction; (g) CMEs promoting the use of opioids to treat chronic non-cancer pain; (h) promotion of misleading scientific studies regarding the safety and efficacy of opioids for long-term treatment of chronic non-cancer pain; (i) misuse and promotion of data to mask the true safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including rates of abuse and addiction and the lack of validation for long-term efficacy; (j) misleading statements in education materials for Florida hospital doctors and staff under guise of educating them on new pain standards; (k) in-person detailing; and (l) withholding from Florida law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs.

249.

Defendant Endo made and/or disseminated deceptive statements, including, but not limited to, the following: (a) false patient education materials; (b) advertising the ability of opioids to improve function long-term and the efficacy of opioids long-term for the treatment of chronic non-cancer pain; (c) promoting chronic opioid therapy as safe and effective for long term use for high-risk patients; (d) Creating and disseminating advertisements that falsely and inaccurately conveyed

the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse; (e) concealing the true risk of addiction and promoting the misleading concept of pseudo-addiction; (f) promoting an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; (g) secretly funding pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (h)funding pro-opioid pain organizations responsible for egregious misrepresentations concerning the use of opioids to treat chronic non-cancer pain; (i) downplaying the risks of opioid addiction in the elderly; (j) CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (k) misleading scientific studies concluding opioids are safe and effective for the long-term treatment of chronic non-cancer pain and quality of life, while concealing contrary data; (l) funding and promoting pro-opioid KOLs concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudo-addiction; (m) manipulation of data regarding safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and (n) in-person detailing.

250.

Defendant Janssen made and/or disseminated deceptive statements, including, but not limited to, the following: (a) patient education materials containing deceptive statements regarding the suitability, benefits, and efficacy of opioids; (b) stating that opioids were safe and effective for the long-term treatment of chronic non-cancer pain; (c) stating that opioids improve quality of life, while concealing contrary data; (d) concealing the true risk of addiction; I promoting the deceptive concept of pseudo-addiction; (f) promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious, and concealing this information; (g) presenting to the public and doctors an unbalanced treatment of

the long-term and dose-dependent risks of opioids versus NSAIDs; (h) funding pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (i) funding pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain; (j) using CMEs to promote false statements concerning the use of opioids to treat chronic non-cancer pain; (k) in-person detailing.

251.

Defendant Cephalon made and/or disseminated untrue, false, and deceptive statements including, but not limited to the following: (a) minimizing the risk of addiction of opioids, (b) promoting the concept of pseudo-addiction, (c) advocating the use of opioids for chronic non-cancer pain, (d) funding misleading CMEs, KOL doctors, and pain organizations, (e) minimizing the addictiveness of Cephalon's potent rapid-onset opioids, and (f) promoting the suitability of Cephalon's rapid-onset opioids to general practitioners, neurologists, sports medicine specialists, and workers' compensation programs.

252.

Defendant Actavis made and/or disseminated deceptive statements, including, but not limited to, the following: (a) promotion of use of opioids to treat chronic non-cancer pain to Louisiana prescribers through in-person detailing; (b) advertising that opioids were safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improved quality of life; (c) advertising that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain.

253.

These false representations and concealments were reasonably calculated to deceive prescribing physicians in the geographic areas served by the **NEW ORLEANS MISSION**, were made with the intent to deceive, and did in fact deceive physicians who prescribed opioids for chronic pain.

254.

But for these false representations and concealments of material fact, the **NEW ORLEANS MISSION** would not have incurred substantial costs and economic loss.

255.

As a direct and proximate cause of Defendants' fraudulent conduct, the **NEW ORLEANS MISSION** has suffered damages.

## COUNT VI – ALL DEFENDANTS

## CIVIL CONSPIRACY

256.

The **NEW ORLEANS MISSION** incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

257.

The Distributor Defendants continuously supplied prescription opioids to the Pharmacy Defendants despite having actual or constructive knowledge that said pharmacies were habitually breaching their common law duties and violating the CSA.

258.

Without the Distributor Defendants' supply of prescription opioids, the Pharmacy Defendants would not be able to fill and dispense the increasing number of prescription opioids throughout the geographic areas served by the **NEW ORLEANS MISSION**.

259.

The Pharmacy Defendants continuously paid the Distributor Defendants to supply large quantities of prescription opioids in order to satisfy the demand for the drugs.

260.

Neither side would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party.

261.

The Pharmaceutical Defendants likewise benefitted from this distribution conspiracy in that the more pervasive opioid diversion became, the more the Pharmaceutical Defendants profited. Despite access to the same information in the hands of the Distributor Defendants, the Pharmaceutical Defendants ignored the warning signs of opioid diversion.

262.

As a result of the concerted actions between and among the Defendants, the **NEW ORLEANS MISSION** has suffered damages.

263.

The **NEW ORLEANS MISSION** demands judgment against each Defendant for compensatory damages.

## COUNT VII – RICO DEFENDANTS

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT PURSUANT TO 18 U.S.C. § 1961, et seq.

264.

The **NEW ORLEANS MISSION** incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

265.

The **NEW ORLEANS MISSION** brings this Count against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

266.

Through Defendants' actions and inactions, including but not limited to Defendants' violations and/or breaches of the statutes, regulations, and duties described herein, Defendants have maintained, directly and/or indirectly, an interest in or control of a RICO enterprise of individuals and/or organizations who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. § 1961, et seq.

267.

The Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts described herein and that are itemized in the RICO laws, and did so in violation of the RICO law at 18 U.S.C. 1962(b). During this time, Defendants also associated with

a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

268.

Likewise, the Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said aforementioned RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1961, et seq.

269.

The **NEW ORLEANS MISSION** further alleges that all Defendants did commit two (2) or more of the offenses itemized herein in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. § 1962(c) et seq.

## COUNT VIII – RICO DEFENDANTS

## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT PURSUANT TO 18 U.S.C. § 1961, et seq.

270.

The **NEW ORLEANS MISSION** repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein, and specifically repeat and re-allege the allegations under the aforementioned Cause of Action concerning RICO liability.

271.

Based on the aforementioned acts and inactions, Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961, et seq.

272.

All Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. § 1962(d).

273.

The **NEW ORLEANS MISSION** further alleges that Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(d) (prohibited activities).

## COUNT X -- RICO DEFENDANTS

## VIOLATIONS OF LOUISIANA RACKETEERING ACT (LSA-R.S. 15:1351 et seq.)

274.

The **NEW ORLEANS MISSION** incorporates by reference all other paragraphs of this Petition as if fully set forth herein, and further alleges as follows.

275.

The **NEW ORLEANS MISSION** brings this Count on behalf of itself against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

276.

RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the RICO Defendants operated as an association in fact and included unlawful as well as lawful enterprises as defined by LSA-R.S. § 15:1352(B).

277.

Section 15:1353 makes it "unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity" and it is unlawful for any person to "conspire or attempt to violate any of the provisions" of LSA-R.S. 15:1353.

278.

The term "enterprise" is defined as including "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." LSA-R.S. 15:1352(B).

279.

For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. Yet, to do just that, the RICO Defendants violated their duties: (1) to comply with all any federal or state laws or regulations relating to controlled substances, to provide effective controls and procedures to guard against theft or diversion of controlled substances; (2) to design and operate a system to disclose to the Manufacturer Defendant suspicious orders of controlled substances; (3) to inform the New Orleans Field Division Office of the DEA, or its successor, of suspicious orders — including orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency — when discovered by the Manufacturer Defendant; (4) to maintain records and file reports; (5) to report whether missing controlled substances are likely candidates for diversion; and (6) to report local trends and other indicators of the diversion potential of missing controlled substances.

280.

Federal and Louisiana law governing the manufacture and distribution of Schedule II substances was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from legitimate channels of trade to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of controlled substances.

281.

Finding it impossible to legally achieve their ever-increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders. As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers that, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA. In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market that allowed them to generate obscene profits.

282.

Defendants' unlawful scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants and executed in perfect harmony by them. In particular, the RICO Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, deceive the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations. The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the **NEW ORLEANS MISSION** experienced tens of millions of dollars of

injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained in detail below, the RICO Defendants' misconduct violated R.S. 14:67 (Theft), R.S. 40:967(A) (Manufacture; distribution of Schedule II controlled dangerous substances), R.S. 14:230 (Money laundering), R.S. 14:133 (Filing or maintaining false public records), and 14:70:1 (Medicaid fraud), and the **NEW ORLEANS MISSION** is entitled to treble damages for its injuries under LSA-R.S. 15:1356(E).

283.

Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of LSA-R.S. § 15:1352 through which the RICO Defendants conducted their pattern of racketeering activity in the State of Louisiana, including within the Parish of Orleans and this judicial district. Specifically, the Healthcare Distribution Alliance (the "HDA") is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" because it is a corporation and a legal entity.

284.

On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

285.

Each of the RICO Defendants is a legal entity separate and distinct from the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants.

Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

286.

The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

**The Opioid Diversion Enterprise**

287.

It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.

288.

At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering

activity throughout the United States, including with the State of Louisiana, Orleans Parish, and this judicial district, through this enterprise.

289.

The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. But, it was not until recently that United States and State regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

290.

At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

291.

The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their unlawful enterprise, engaged in a pattern of racketeering activity, that involves a fraudulent scheme to increase revenue by violating state and federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

292.

Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

293.

Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing

coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

294.

The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum ("PCF"), the HDA, and through their contractual relationships.

295.

Not surprisingly, each of the RICO Defendants who stood to profit from fraudulently promoting prescription opioid use is a member of and/or participant in the PCF. At pertinent times, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen Pharmaceuticals), Actavis (i.e., Allergan), and Teva (the parent company of Cephalon). Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA. The **NEW ORLEANS MISSION** is informed and believes that the Distributor Defendants participated directly in the PCF as well.

296.

The Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drug makers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted efforts that the PCF undertook on behalf of its members.

297.

Second, the HDA — or Healthcare Distribution Alliance — led to the formation of interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis (i.e., Allergan), Endo, Purdue, Mallinckrodt and Cephalon were members of the HDA. And, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

298.

In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference, network with HDA wholesale distributor members, host and sponsor HDA Board of Directors events, participate on HDA committees, task forces and working groups with peers and trading partners,

and make connections. Membership in the HDA created interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

299.

The councils, committees, task forces and working groups of the HDA provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

300.

Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

301.

The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids. There exists an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales. On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices. The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

302.

The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Upon information and belief, the Manufacturer Defendants negotiated agreements whereby the Manufacturer Defendants installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Upon information and belief, these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

303.

Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of the RICO Defendants were in communication and cooperation.

304.

As described above, the RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Upon

information and belief, the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## Conduct of the Opioid Diversion Enterprise

305.

At all times pertinent, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their Federal and State obligations to identify, investigate, and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate unlawful profits.

306.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

307.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

308.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

309.

The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

310.

The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Upon information and belief, the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, upon information and belief, the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

311.

The Manufacturer Defendants deceived the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

312.

The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids. On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-

controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

313.

The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the suspicious orders despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants for failure to report suspicious orders.

314.

Defendants' scheme had a decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

315.

The RICO Defendants worked together to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to

increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders.

316.

The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## DAMAGES

317.

Defendants' intentional and/or unlawful conduct, as described herein, resulted in direct and foreseeable, past and continuing, economic damages which the **NEW ORLEANS MISSION** has incurred and continues to incur, including the unreimbursed and/or un-recouped costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (b) counseling and rehabilitation services; (c) security and public safety; (d) added regulatory compliance; (e) lost opportunity costs; (f) the diversion of assets from the provision of other needed health care; and (g) increased human resources costs as well as lost productivity of its employees. Plaintiff also seeks the means to abate the epidemic (created by Defendants' wrongful and/or unlawful conduct), including but not limited to economic damages from the Defendants as reimbursement for the costs associated with past, present, and future efforts to address, pay for, and/or eliminate the aforementioned hazards to public health and safety.

318.

The **NEW ORLEANS MISSION** has incurred and seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' actions and omissions, including all counts alleged against Defendants. The **NEW ORLEANS MISSION** does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

319.

Other than such damages specifically disavowed herein, the **NEW ORLEANS MISSION** seeks all legal and equitable relief as allowed by law (for all counts alleged against Defendants), including inter alia injunctive relief, restitution, disgorgement of profits, compensatory, treble and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

320.

In accordance with Louisiana Civil Code Article 2324, all Defendants are solidarily liable.

321.

The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused the **NEW ORLEANS MISSION** injury in its business and property because the **NEW ORLEANS MISSION** paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference. The **NEW ORLEANS MISSION'S** injuries were directly and/or proximately caused by Defendants' racketeering

activities. But for the RICO Defendants' conduct, the **NEW ORLEANS MISSION** would not have incurred the aforementioned economic costs and expenditures required as a result of the plague of drug-addicted residents. The **NEW ORLEANS MISSION** was most directly harmed and there is no other plaintiff better suited to seek a remedy for the economic harms at issue here. The **NEW ORLEANS MISSION** seeks all legal and equitable relief as allowed by law, including inter alia actual damages (as described above in language expressly incorporated herein by reference), treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, the **NEW ORLEANS MISSION** prays that the Court grant the following relief:

i. Compensatory Damages in an amount sufficient to fairly and completely compensate the Plaintiff for all damages;

ii. Injunctive Relief;

iii. Civil Penalties;

iv. Punitive Damages;

v. Attorneys' fees and costs; and

vi. All such other relief this Court deems just and proper.

*[Signature block on following page.]*

Respectfully submitted:

*Glago Williams, LLC*

/s/ Mark P. Glago

**Mark P. Glago, Bar No. 25395**
**Jatavian Williams, Bar. No. 33431**
**Katherine E. May, Bar No. 32578**
**Marissa A. Hutabarat, Bar No. 33578**
First Bank & Trust Tower - 29th Floor
909 Poydras Street
New Orleans, Louisiana 70112
Telephone: (504) 599-8666
Facsimile: (504) 599-8699
mglago@glagolawfirm.com
jwilliams@glagolawfirm.com
kmay@glagolawfirm.com
mhutabarat@glagolawfirm.com

**and**

***Irpino, Avin, & Hawkins, LLC***
**Anthony D. Irpino, Bar No. 24727**
**Pearl Robertson, Bar No. 34060**
2216 Magazine Street
New Orleans, LA 70130
Telephone: (504) 525-1500
Facsimile: (504) 525-1501
airpino@irpinolaw.com
probertson@irpinolaw.com
***Attorneys for Plaintiff***

*[Service instructions on following pages.]*

**PLEASE SERVE:**

**MCKESSON CORPORATION**
through its Agent for Service of Process,
Corporation Service Company
501 Baton Rouge, LA 70802;

**CARDINAL HEALTH, INC.**
**via Long Arm Statute**
through its Agent for Service of Process,
Chief Legal Officer
7000 Cardinal Place
Dublin, OH 43017;

**AMERISOURCE BERGEN,**
through its Agent for Service of Process,
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816;

**CVS HEALTH,**
**via Long Arm Statute**
through its Agent for Service of Process,
One CVS Drive
Woonsocket, RI 02895;

**WALGREENS BOOTS ALLIANCE, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
108 Wilmot Rd.
Deerfield, IL 60015;

**WAL-MART STORES, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
702 SW 8th Street
Bentonville, AR 72716-8611;

**PURDUE PHARMA, L.P.,**
**via Long Arm Statute**
through its Agent for Service of Process,
Corporation Service Company, 80 State Street,
Albany, NY 12207-2543;

*[Service instructions continued on following pages.]*

**PURDUE PHARMA, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
Corporation Service Company, 80 State Street,
Albany, NY 12207-2543;

**THE PURDUE FREDERICK COMPANY, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
Corporation Service Company, 80 State Street,
Albany, NY 12207-2543;

**TEVA PHARMACEUTICALS USA, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
Corporation Creations Network, Inc., 15 North Mill Street,
Nyack, NY 10960;

**CEPHALON, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
Corporation Creations Network, Inc., 15 North Mill Street,
Nyack, NY 10960;

**JOHNSON & JOHNSON,**
**via Long Arm Statute**
through its Agent for Service of Process,
One Johnson & Johnson Plaza,
New Brunswick, NJ 08933;

**JANSSEN PHARMACEUTICALS, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
C.T. Corporation System, 600 N. 2nd St., Suite 401,
Harrisburg, PA 17101;

**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
C.T. Corporation System, 600 N. 2nd St., Suite 401,
Harrisburg, PA 17101;

*[Service instructions continued on following page.]*

**ENDO HEALTH SOLUTIONS, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
C.T. Corporation System, 111 Eights Avenue,
New York, NY 10011;

**ENDO PHARMACEUTICALS, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
C.T. Corporation System, 111 Eights Avenue,
New York, NY 10011;

**ALLERGEN PLC f/k/a ACTIVIS PLC,**
**via Long Arm Statute**
through its Agent for Service of Process
400 Interpace Pkw.
Parsippany, NJ 07054;

**WATSON PHARMACEUTICALS, INC., n/k/a ACTIVIS, INC., WATSON LABORATORIES, INC.,**
**via Long Arm Statute**
through its Agent for Service of Process,
400 Interpace Pkw.
Parsippany, NJ 07054; and

**ACTIVIS, LLC., AND ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.**
**via Long Arm Statute**
through its Agent for Service of Process,
400 Interpace Pkw.
Parsippany, NJ 07054

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record and/or registered agents by placing same in the United States mail, properly addressed and postage pre-paid, or via facsimile or electronic transmission, or by any other means allowed by law on this 2nd day of August, 2018.

/s/ Mark P. Glago